**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**SCOTTY ALLEN DUNCAN,**

        **Plaintiff,**

**-vs-**　　　　　　　　　　　　　　　　　　　　　　　　**Case No.  6:15-cv-727-Orl-DAB**

**CAROLYN W. COLVIN, ACTING**
**COMMISSIONER OF SOCIAL**
**SECURITY,**

        **Defendant.**

_____

# Memorandum Opinion & Order

The Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title 42 United States Code Section 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) denying his claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under the Act.

The record has been reviewed, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case.  Oral argument has not been requested.

For the reasons that follow, the decision of the Commissioner is **affirmed.**

## I.　　BACKGROUND

### A.　　Procedural History

Plaintiff filed for a period of disability, DIB and SSI benefits on December 29, 2011 and March 16, 2012, alleging an onset of disability on October 26, 2011[1], due to atrial fibrillation, Graves

---

[1] Plaintiff initially alleged disability beginning on December 15, 2006. R. 244. He subsequently amended his alleged onset date to October 26, 2011. R. 276.

disease, diffuse goiter, and a seizure disorder. R. 33-36, 244, 257, 276, 282.  His application was denied initially and upon reconsideration[2]. Plaintiff requested a hearing, which was held on August 21, 2013, before Administrative Law Judge Janet Mahon (hereinafter referred to as "ALJ").  R. 118-57. In a decision dated September 10, 2013, the ALJ found Plaintiff not disabled as defined under the Act through the date of her decision. R. 12-21.  Plaintiff timely filed a Request for Review of the ALJ's decision, which was denied on March 20, 2015. R. 1, 7-8.  Plaintiff filed this action for judicial review on May 7, 2015.  Doc. 1.

### B.     Medical History and Findings Summary

Plaintiff, was born on August 16, 1975, and he was 36 years old at the time of his alleged onset date, October 26, 2011. R.. 244, 276.  Plaintiff graduated high school with a "special diploma"and worked in the past as a warehouse stocker, a driver and a pump truck operator. R. 31-32. He was insured for benefits through June 30, 2014. R. 264.

Plaintiff's medical history is set forth in detail in the ALJ's decision.  By way of summary, Plaintiff complained of atrial fibrillation, diffuse goiter, and Graves disease. R. 67.  After reviewing Plaintiff's medical records and Plaintiff's testimony, the ALJ found that Plaintiff suffered from a history of coronary artery disease, goiter; seizures; and hypertension, which were "severe" medically determinable impairments, but were not impairments severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  R. 14-16. The ALJ determined that, due to his seizures, Plaintiff retained the residual functional capacity (RFC) to perform sedentary work, and would be limited to occasionally climbing ramps or stairs, should never

---

[2]Plaintiff previously filed an application on July 28, 2010, and, on October 7, 2011, Administrative Law Judge Albert D. Tutera, held a hearing and  authored an unfavorable decision--signed by Deborah A. Arnold– finding Plaintiff not disabled from February 10, 2009 though the date of the decision October 19, 2011. R. 51-60.  It does not appear that Plaintiff appealed this decision, but he did file new applications for benefits on December 29, 2011 and March 16, 2012 based on an alleged onset date one week after the first decision date, on October 19, 2011.

climb ladders, ropes, or scaffolds, and avoid even moderate exposure to hazards in the workplace, such as working heights and machinery; due to the combined impact of his impairments, he should perform only simple tasks. R. 17. Based upon Plaintiff's RFC, the ALJ determined that he could not perform past relevant work. R. 20. Considering Plaintiff's vocational profile and RFC, the ALJ applied the Medical-Vocational Guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2, and, based on the testimony of the vocational expert ("VE"), the ALJ concluded that Plaintiff could perform work existing in significant numbers in the national economy as monitor, document preparer, and addresser. R. 20-21. Accordingly, the ALJ determined that Plaintiff was not under a disability, as defined in the Act, at any time through the date of the decision. R. 21.

Plaintiff now asserts three points of error. First, he argues that the ALJ erred by finding he had the RFC to perform sedentary work contrary to his treating physician's statements. Second, he contends the ALJ erred by finding that he could perform sedentary work when there was no accepted medical evidence in the record to support this finding. Third, Plaintiff contends that the ALJ erred in finding that he could perform other work in the national economy without explaining how he could work in spite of his history of receiving substantial medical treatment.

For the reasons that follow, the decision of the Commissioner is **AFFIRMED**.

## II.  STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – *i.e.,* the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable

person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004). "We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]" *Id.* (internal quotation and citation omitted). *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, he is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering his residual functional capacity, age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled. 20 C.F.R. § 404.1520(f).

## III.    ISSUES AND ANALYSIS

### A. RFC and Plaintiff's physical impairments[3]

Plaintiff argues that the ALJ should not have found him able to perform sedentary work in light of physical limitations assigned by his treating endocrinologist, Dr. Matthews, who opined Plaintiff had extensive limitations precluding the performance of sedentary work.

Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite her impairments. 20 C.F.R. § 404.1545(a); *Lewis v. Callahan*, 125 F.3d 1436,1440 (11th Cir. 1997). The focus of this assessment is on the doctor's evaluation of the claimant's condition and the medical consequences thereof. *Id.* Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis*, 125 F.3d at 1440; *Edwards*, 937 F.2d at 583; 20 C.F.R. §§ 404.1527(d), 416.927(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

The Regulations establish a "hierarchy" among medical opinions that provides a framework for determining the weight afforded each medical opinion: "[g]enerally, the opinions of examining physicians are given more weight than those of nonexamining physicians, treating physicians' opinions are given more weight than non-treating physicians and the opinions of specialists are given more weight on issues within the area of expertise than those of nonspecialists." *McNamee v. Soc.*

---

[3]Plaintiff does not challenge the ALJ's findings as to the severity of his mental impairments.

*Sec. Admin.*, 162 F. App'x 919, 923 (11th Cir. Jan. 31, 2006) (unpublished) (citing 20 C.F.R. § 404.1527(d)(1), (2), (5)). The following factors are relevant in determining the weight to be given to a physician's opinion: (1) the "[l]ength of the treatment relationship and the frequency of examination"; (2) the "[n]ature and extent of [any] treatment relationship"; (3) "[s]upportability"; (4) "[c]onsistency" with other medical evidence in the record; and (5) "[s]pecialization." 20 C.F.R. §§ 404.1527(d)(2)-(5), 416.927(d)(2)-(5); see also 20 C.F.R. §§ 404.1527(f), 416.927(f).

Plaintiff contends that the ALJ improperly rejected the opinion of his treating physician, Dr. Matthews on the physical capacity evaluation dated May 10, 2013. R.1076-80. Dr. Matthews opined that Plaintiff was unable to perform the exertional demands of sedentary work and was restricted to sitting only 2 hours per day and up to 30 minutes at one time. R. 1077-78. Plaintiff contends that the ALJ erred in giving this opinion "little weight" because Dr. Matthews' notes document Plaintiff's severe limitations, including the ones from May 2, 2013, when Dr. Matthews evaluated Plaintiff at Health Central Hospital. R. 1156. Dr. Matthews noted Plaintiff had post-surgical hypothyroidism, and longstanding Graves disease[4] that was poorly controlled, which resulted in several admissions for atrial fibrillation; had also had irregular heartbeats, syncope, and possible seizures. R. 1156. Plaintiff also contends that the ALJ erred in rejecting Dr. Matthews opinion based on two other consultations, one of which was by a different doctor, Dr. Ranadive on May 30, 2011 (R. 393), which was before the alleged onset date, and one by a cardiologist, Dr. Bajaj (R. 1183-84), even though Dr. Matthews is Plaintiff's endocrinologist.

Plaintiff argues that the only two physicians who addressed exertional limitations were state agency reviewing physician (Dr. Baltazar) and treating physician Dr. Matthews, but the ALJ rejected both of these opinions, giving them "little weight" and nevertheless found Plaintiff could perform

---

[4]"Graves disease" is a condition with a toxic goiter characterized by diffuse hyperplasia of the thyroid glad, a form of hyperthyroidism. STEDMANS MEDICAL DICTIONARY at 557 (28th ed. 2006).

sedentary work even though "there is no medical evidence to support the ALJ's finding Plaintiff can perform sedentary work." Doc. 20. Plaintiff alternatively argues that, to the extent the ALJ relied on the reviewing physician's opinion she erred because Plaintiff's seizures began after the reviewing physician completed his opinion in June 2012 and before the neurologist Dr. Honeycutt first diagnosed Plaintiff with seizures and partial epilepsy in October 2012.

The Commissioner contends that substantial evidence supports the ALJ's decision that Plaintiff retained the RFC for a limited range of sedentary work, and the ALJ properly considered all of the relevant evidence, including the records and opinions of the physicians who opined on Plaintiff's functional capacity. Doc. 21. The Commissioner argues that ALJ properly weighed the opinion evidence from Dr. Matthews and provided good reasons supported by substantial evidence for giving his opinion less weight. The ALJ rejected Dr. Matthews' opinion for the following reasons:

> Victor W. Matthews, M.D., who has treated claimant, opined that claimant's symptoms constantly interfere with attention and concentration, that the claimant is incapable of performing even "low stress" jobs, cannot walk even one city block without resting, can sit for only thirty minutes at a time, can stand for only one hour at a time, can sit, stand, or walk for less than two hours in an eight-hour workday. Dr. Matthews also opined that the claimant does not need a job that requires shifting positions at will, but will need to take a fifteen minute, unscheduled, break every thirty minutes, but the claimant does not need to have his legs elevated with prolonged sitting. . . . Dr. Matthews' opinion is not consistent with the claimant's own self-reported daily activities, such as being able to independently dress and bathe himself, walking independently, grocery shopping without assistance, managing his own food stamp account. . . . Furthermore, the claimant also admitted to arranging for transportation with friends, preparing his own meals, handling his own mail, using public transportation independently, enjoying watching television, playing video games, and "hanging out with his friends."
>
> Moreover, Dr. Matthews' opinion is not consistent with the overall normal results obtained throughout his medical consultations, such as "no evidence of acute coronary syndrome, cardiac enzymes were all negative, and electrocardiogram showed no acute ST-T wave abnormalities," heart sounds and rhythm were normal, as his blood

>pressure was controlled[5] at 112/88, and on July 15, 2013, the claimant again visited the emergency room self-reporting seizures, but review of symptoms showed normal results, except a slightly altered EKG.

R. 19 (internal citations omitted). The Commissioner also points to Plaintiff's testimony at the hearing that he traveled by bus to attend doctor appointments and to visit his mother who lived forty miles away and that he walked "about a quarter of a mile" just to get to the bus, as also contradicting Dr. Matthews' opinion that Plaintiff could not walk even one city block without rest or severe pain. R. 1077, 1113.

The Commissioner also argues that, in addition to the specific examples cited by the ALJ, the objective findings of numerous other treating physicians fail to support Dr. Matthews' opinion and are inconsistent with the limitations identified by Dr. Matthews. The Commissioner contends that Plaintiff's treating physicians repeatedly described Plaintiff as appearing in no acute distress and having a normal gait, which undermines Dr. Matthews' opinion that Plaintiff could not walk even one city block without severe pain or needing to rest. Doc. 21 (citing R. 393, 435, 440, 455, 460, 463, 470, 475, 653, 758, 863, 949-55, 961, 964, 974, 980, 1074, 1077, 1089). The Commissioner also argues that it was appropriate for the ALJ to rely on the findings of the cardiologist, Dr. Bajaj, regarding Plaintiff's cardiac condition because Dr. Matthews has a different specialty, endocrinology, and his opinion specifically listed atrial fibrillation, a heart condition, as a basis for his limitations. The Commissioner also points out that Dr. Matthews' opinion primarily discusses Plaintiff's seizure disorder, which is the only condition he specifically cites as the basis for a limitation (citing R. 1076-77). The Commissioner also cites Dr. Partain's Fall 2012 findings of no significant abnormality and description of Plaintiff as "in generally good health" and "a talkative gentleman who appears in

---

[5] The Commissioner cites the May 2011 records from Nandkishore Ranadive, M.D., which document that Plaintiff had negative cardiac enzymes, no acute ST-T wave abnormalities, and no evidence of acute coronary syndrome and the July 2013 records from cardiologist Neeray Bajaj, M.D., which indicated that Plaintiff's blood pressure was 112/88 and his heart rhythm was normal. R. 393-94, 1184-85 (cited by the ALJ on R. 19).

no acute distress" (R. 993) and the June 2012 normal electrocardiogram (R. 833), and stress tests, two catheterizations and a carotid study performed in Fall 2012, which were all negative or normal. R. 1101.

The Commissioner also points to October 2012 records from Plaintiff's primary care physician Dr. Ware noting Plaintiff reported having no episodes of palpitations after his thyroidectomy and denied chest pain, tingling/numbness, seizures, or dizziness, had a normal gait, no gross deficits, and "look[ed] well." R. 1037-39, 1105. In July 2013, neurologist Dr. Varnedore examined Plaintiff and observed no significant abnormality upon examination, and Plaintiff's treating neurologist, Dr. Honeycutt, repeatedly observed that Plaintiff had normal recent and remote memory and normal attention span and concentration. R. 974, 1074, 1089, 1182.

The Commissioner additionally argues that the normal results of extensive diagnostic testing further support the ALJ's decision to afford little weight to Dr. Matthews' opinion (R. 1076) that Plaintiff has persistent paralysis and weakness following seizures in light of EEG studies in Fall 2012 which showed no evidence of epileptiform activity or any other abnormality. R. 973, 978, 1072. The Commissioner cites MRI studies of his Plaintiff's brain and cervical spine performed in response to complaints of numbness and paresthesias, the results of which showed no abnormalities. R. 973.

Based on a review of the entire longitudinal record, it is clear that Plaintiff's Graves disease-thyroid condition has been exacerbated by his failure to take his medications as described; this has also led to increased seizure-like activity and atrial fibrillation which were considered "stable" by the August 2013 hearing. On multiple occasions when Plaintiff sought emergency room treatment, by his own admission, he had failed to comply with the instructions to take his medications as prescribed, and his atrial fibrillation or his seizures (which he testified usually preceded the palpitations) increased; he similarly did not take his cardiac medications as prescribed.

Prior to 2011, in 2009 and 2010, Plaintiff had lengthy gaps in medical treatment. R. 57. But Plaintiff gave a history to a doctor, that since his early 20's, he had had significantly elevated thyroid hormone (FT4) levels with a very normal TSH, and this phenomena had been going on; he had also had episodic tachy arrythmias, and he had been treated with beta blocker with apparent success. R. 419. When he was examined in November 2010, Dr. Farrell at the Community Health Center noted Plaintiff had an abnormal thyroid function study, and he was referred to endocrinology through the Orange County Medical Clinic. R. 404. In January 2011, he began treatment with an endocrinologist, Dr. Constant for treatment of his thyroid problems; Plaintiff had abnormal thyroid blood testing and significant elevated FT4 level; he had never been on thyroid related medications; he was feeling fairly well and had not had any episodes for several months. R. 415. He failed to have the prescribed testing on his thyroid levels by the time he returned for the March 1, 2011 appointment, and he was "unaware of how this happened." R. 419. Without the testing ordered at the January appointment, Dr. Constant had no further advice to offer. R. 422. Two weeks later, on March 16, 2011, Dr. Constant noted that Plaintiff had the labs, but they were again incomplete, but it was noted he had normal TSH with significantly elevated thyroid hormone (T3). R. 423. As the ALJ noted, although Plaintiff had elevated TT3 levels, his TT4 was within normal limits, and his elevated TSH level was to be expected, but he had never taken any thyroid medication before November 2011. R. 18. He was diagnosed with Graves disease and diffuse toxic goiter and continued with conservative treatment. R. 18. Dr. Constant suspected Plaintiff had Graves disease causing hyperthyroidism, with an inappropriately normal TSH; he would need further workup for TSH abnormality including complete pituitary testing and imaging once the thyroid hormone level was slowed. R. 426. In April 2011, Dr. Constant noted that he had put Plaintiff on Methimazole at the last visit. R. 428. Plaintiff reported that he did "feel a bit better with lessening palpitations." R. 428.

Plaintiff was subsequently admitted to Florida Hospital on May 29, 2011 complaining of chest pain on his left side; a stress test done in 2010 and a cardiac catheterization in 2009 did not show any evidence of significant coronary artery disease, he had normal coronary arteries and ventricular systolic function, but he had a self-reported history of "thyroid storms" and hyperthyroidism. R. 388-90, 394. He was diagnosed with "clearly non-cardiac chest pain, likely musculoskeletal." R. 394. At his June 2011 appointment, Plaintiff told Dr. Constant that he was noting improvement in his symptoms until May 29, 2011 when he began having chest pain. He was seen in the emergency room and admitted. R. 458. Unfortunately his Methimazole was discontinued during hospitalization and his thyroid hormones were elevated; he had been off the Methimazole medication for one week and he had noted increased palpitations. R. 458. At the August 2011 appointment Plaintiff's thyroid hormone levels had fallen nicely, but his thyroid felt bigger and firmer than previously. R. 461-63, 470.

At his October 26, 2011 appointment with Dr. Constant, his thyroid hormone levels had fallen below normal, but his TSH was still elevated due to inappropriate TSH production and Plaintiff reported feeling fatigued and complained of increasing lower anterior neck fullness; Plaintiff reported he was able to exercise modestly. R. 433-34. He was diagnosed with Graves disease (diffuse toxic goiter). R. 436. Plaintiff subsequently alleged an onset date for disability of October 26, 2011 (R. 276) after his first application was denied on October 19, 2011 (R. 51-60). In November 2011, Dr. Constant decreased Plaintiff's dosage of Methimazole due to over suppression; his FT4 was normal but the TT3 was elevated and the TSH was elevated as expected in this patient "who has inappropriate pituitary response to thyroid hormone levels." R. 438. A thyroid ultrasound was abnormal and "he strongly wishe[d] to get his thyroid removed. No thyrotoxic symptoms." R. 438, 476.

-11-

Plaintiff was referred to Orlando Health Surgery Practice in February 2012 for removal of the goiter. R. 490. Dr. McGrier at Orlando Health noted Plaintiff had been evaluated by "multiple subspecialities at multiple hospitals," and "Patient [came] in with a history of recurrent chest discomfort and palpitations and has multiple complaints including an 8/10 headache. He recently had an MRI, which did not show any brain mass, only a pineal cyst. He has had evaluation by the endocrinologist as well as the cardiologist in the past and has come in because he 'would like everything fixed today.' The patient has in the past complained of 8/10, today complained of 8/10 headache and has been improved with Tylenol." R. 492. Cardiac testing, repeat echocardiogram and catheterization, in July 2011 had normal results. R. 494-95.

Plaintiff was hospitalized from March 19, 2012 to April 3, 2012 for complaints of atrial fibrillation and Graves disease; he was evaluated by an endocrinologist Dr. Matthews and was recommended for a thyroidectomy as an outpatient. R. 506-07. Plaintiff admitted to being out of prescribed Methimazole thyroid medication and not taking it. R. 506-07. Dr. Matthews' noted Plaintiff "used to see" his former partner, Dr. Constant, "in the past," but he had apparently stopped seeing him. R. 655. Plaintiff had what Dr. Matthews characterized as a "longstanding history of having ER visits for uncontrolled hyperthyroidism. He has a goiter, but due to lack of insurance he has not undergone radioactive iodine treatment nor surgery." R. 655. Plaintiff was to be scheduled for a total thyroidectomy once he was medically stabilized, because he had had multiple other episodes requiring hospitalizations, and his current symptoms of compression were difficulty swallowing and change in voice. R. 650, 656.

Plaintiff subsequently developed abdominal pain while in the hospital and instead had laparoscopic surgery to remove his gallbladder; he also developed issues with hypertension as well as uncontrolled rapid ventricular response; cardiology was able to control his heart rate and he

-12-

converted into sinus rhythm. R. 508. A CT scan of his head, carotid ultrasound, and heart catheterization performed during the time period were all normal. R. 517-18, 524. On the same day he was released, Plaintiff returned to the emergency room complaining of atrial fibrillation, stating "he did not want to be seen by [a doctor]. He only wanted to make sure he was not in A-fib." R. 566. An EKG interpretation showed he was in sinus rhythm, and he left against medical advice without seeing the doctor. R. 566-67. In March 2012, in a telephone conversation, Plaintiff told the with SSA staff that he gets occasional rapid heart beat with exertional activities and he was "very adamant that he feels he is disabled because he will have to take medicine for the rest of his life with having his thyroid removed." R. 88. When Plaintiff returned to the Community Health Center two weeks after his hospital stay, on April 18, 2012, he reported that he had not yet made an appointment for surgery with endocrinology to have his thyroid removed, and his thyroid hormones level (TSH, T3, and T4) remained abnormal; he was described as a "poor historian" and he did not bring in his medications for the physician to review. R. 968-70.

Plaintiff returned three months later to Florida Hospital and was transferred Health Central Hospital, in June 2012, and ended up having his thyroid removed. Emergency room physicians at the time noted Plaintiff reported "running out of his Methimazole and Verapanil approximately one week ago *which likely triggered his current episode*" of atrial fibrillation and palpitations. R. 722-25 (emphasis added), 854. The cardiology and endocrinology departments were consulted and Plaintiff's atrial fibrillation was brought under control by the cardiologist, but he still had multiple episodes of rapid ventricular rate, so Plaintiff had a thyroidectomy during his hospital stay; once he was stabilized he was discharged and started back on Coumadin. R. 854. Plaintiff was told to follow up the following Monday with the cardiology department at the Orange County Medical Clinic because there was a significant risk of receiving the medicine without PT/INR checks, however, he

had not followed up as directed as of July 19, 2012. R. 854, 1064. He was considered a "non-compliant" patient because he had not picked up the prescribed medications. R. 1067. Dr. Farrell at Community Health Center noted that Plaintiff was trying to obtain SSI and had appointments with cardiology and endocrinology. R. 951.

Plaintiff was seen in the Orange County Medical Clinic's Cardiology Clinic on August 30, 2012 by Dr. Partain after a one and a half year interval, for his history of paroxysmal atrial fibrillation, with episodes usually lasting a few hours and then disappearing spontaneously, and recurring chest discomfort which is quite atypical; two heart catheterizations that were normal. R. 992. Dr. Partain recommended that Plaintiff be followed by an endocrinologist and, when his thyroid medication is stable, he should be referred back to the cardiac clinic. R. 993. "At that point, it might be reasonable to switch him to Dronedarone, to see if his paroxysmal atrial fibrillation can be controlled medically. Alternatively, ablation could be discussed." R. 993. He was also recommended to see a neurologist for the numbness on his left side. R. 993. Plaintiff reported not having any episodes of palpitations from June 2012, when he had the thyroidectomy, to October 2012, but he had started taking a reduced dose of the Coumadin "his own way," *i.e.*, five days a week and a higher dose two days per week; Dr. Ware clarified dosing and importance of close communication regarding his Coumadin management." R. 1037, 1039.

Two months later, on October 29, 2012, Plaintiff went to the neurologist, Dr. Honeycutt. R. 973. Dr. Honeycutt assessed Plaintiff with localization-related (focal) (partial) epilepsy and epileptic syndromes with simple partial seizures, without mention of intractable epilepsy, and prescribed Keppra; an EEG performed in the office had normal results. R. 973-77. When Plaintiff returned to Dr. Honeycutt in November 2012 he reported he stopped the Keppra after one week due to complaints

of nausea and vomiting; his prescription was changed to Gabapentin, and he was told to return to the office if his symptoms were not controlled on the prescribed dose after one week. R. 980.

In January 2013, Plaintiff returned to Neurology Associates for follow up of a history of possible partial-onset epilepsy. R. 1072. He reported having seizures/spells two times per week and lasting about four hours on average and feeling fatigued and "out of it" for the remainder of the day. R. 1072. As the ALJ noted, although Plaintiff self-reported[6] four seizures in all of 2012 and more than thirty seizures in the first eight months of 2013 increasing in severity, he asked that his medication be reduced from 900 mg to 600 mg because the Gabapentin at the higher dose made him feel too sleepy, and when he took the higher dose that was prescribed, he only had one mild seizure once per week. R. 18. Dr. Honeycutt noted that he had not been taking as much Gabapentin as prescribed, because on the prescribed dose he felt too sleepy, on the higher prescribed dose, Plaintiff reported having had one very "mild" seizure once a week, which he described as an abnormal sensation but no loss of consciousness or ability to have normal cognition. R. 1072. Despite this history, Plaintiff testified at the August 21, 2013 hearing that the "seizure doctor told [him] that this is the worst seizure that [he] could possibly have" and the doctors "could not tell him" whether they were petit or grand mal seizures because "they frequently come and go so much." R. 33-35.

The ALJ also noted that at Plaintiff's July 15, 2013 visit to the emergency room complaining of seizures, the review of symptoms showed normal results, except a slightly altered EKG, normal electroencephalography (EEG) and he was sent home the same day with a recommendation to continue with his normal home care. R. 18. Records of the Emergency Room visit for a seizure on July 15, 2013 reflect Plaintiff's report that it was "exactly like his normal seizures" and that he had been *out of his medication for three days*. R. 1186 (emphasis added). All other medical conditions

---

[6] Plaintiff made these reports according to the records of Community Health Centers (Exhibit B18F) and Orange County Medical Clinic (Exhibit B20F). R. 18.

-15-

were described as "stable," and he was referred to his primary care physician for medication adjustments. Doc. 1179, 1181 ("remote thyroidectomy"; "extremely poor historian"). Plaintiff told Dr. Varnedore in the E.R. on July 15, 2013 that "he had been diagnosed with a terminal seizure disorder and that his neurologist gave him 15 years to live because of this unnamed terminal seizure disorder." R. 1181. There is no support in Dr. Honeycutt's records for such a diagnosis.

Plaintiff argues that the Physical RFC Questionnaire dated May 10, 2013 completed by Dr. Matthews, the endocrinologist, supports the debilitating level of his symptoms. Dr. Matthews noted that Plaintiff suffered from epilepsy, Graves Disease, and atrial fibrillation "since 2011." R. 1076. However, Dr. Matthews was discussing two conditions which appeared to be under control after June 2012: he listed Graves Disease, or diffuse toxic goiter, even though Plaintiff's thyroid had been removed in 2012, and atrial fibrillation, even though Plaintiff had not had a reported episode since June 2012, once he began treatment with Coumadin. As the Commissioner points out, Dr. Matthews, as an endocrinologist was essentially opining about Plaintiff's neurological issues from the seizures, which were not within his specialty. According to the neurologist, Dr. Honeycutt, Plaintiff had not been taking the prescribed medication Gabapentin as prescribed, and when he did take it as prescribed, he had one "mild" seizure per week (R. 1072), as the ALJ noted.

Unquestionably, Plaintiff has numerous medical issues with varying effects on his functional capacity. The ALJ reviewed and analyzed the medical records at length and with great care, assessing the sometimes conflicting indications in detail and as a whole. It is not the Court's function re-weigh the assessment or to decide whether a different conclusion might also have been reached on the same record. Based on the longitudinal record of Plaintiff's health history, the ALJ's decision was based on substantial evidence.

### B. Other work in the economy

Plaintiff argues that the ALJ erred in finding that he could perform other work in the national economy without explaining how he could work "in spite of his history of receiving substantial medical treatment." He essentially argues that the ALJ erred in relying on the VE's response to a hypothetical which did not contain all of his limitations, including that he would miss a substantial number of days for medical treatment. Doc. 20. Plaintiff points to the approximate 81 days he was treated (8) or hospitalized (73) in the twenty-two month period between his alleged onset date (October 26, 2011) and the hearing date (August 21, 2013). Doc. 20 (citing R. 468-79, 484-938, 955-81, 988-93, 1004-11, 1072-75, 1114-95). Plaintiff points out that, in answer to the ALJ's question, the VE testified that in addition to other restrictions, if the hypothetical individual was absent from work more than four days a month, there would be no work in the national economy the hypothetical individual could perform. R. 46.

As explained in great detail above, Plaintiff's long-running problems with Graves disease and its consequences were not immediately stabilized and he did experience on-going issues with atrial fibrillation and seizures. Once his thyroid was removed and he was taking the prescribed medications consistently, his thyroid and atrial fibrillation stabilized. To the extent he experienced seizures, these stabilized as "mild" once Plaintiff was taking the correct dosage of the prescribed medication. His emergency room visits and treatment were often caused by his own failure to take medication as prescribed. The ALJ properly considered the objective medical evidence in finding that Plaintiff was capable of other work in the national economy and in relying on the VE's testimony.

## IV. CONCLUSION

The record in this case shows that Plaintiff does not enjoy full health and that his lifestyle and activities were affected by his ailments to some degree, but have stabilized. The ALJ appropriately considered these circumstances and analyzed them in relation to the exacting disability standard under

the Social Security Act. For the reasons set forth above, the ALJ's decision is consistent with the requirements of law and is supported by substantial evidence. Accordingly, the Court **AFFIRMS** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on August 18, 2016.

*David A. Baker*
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record